**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-10955

FRANK BASIL McFARLAND

Petitioner-Appellant

VERSUS

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Texas
(4:96-CV-241-A)

February 13, 1998

Before DAVIS, JONES, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.[1]

Frank Basil McFarland, a Texas death row inmate, seeks a certificate of probable cause or, in the alternative, a certificate of appealability permitting him to appeal the district court's denial of his request for a writ of habeas corpus and its lifting

---

[1]Pursuant to Local Rule 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

of its stay of execution. The district court granted leave to proceed in forma pauperis on appeal but declined to issue a certificate of probable cause ("CPC").

McFarland filed his habeas petition in the district court on April 3, 1996. In Lindh v. Murphy, 117 S.Ct. 2059, 2068 (1997), the Supreme Court held that the amendments to 28 U.S.C. § 2254 contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), do not apply to cases pending on the April 24, 1996, effective date of the Act. See also Nobles v. Johnson, 127 F.3d 409, 412-13 (5th Cir. 1997); Williams v. Cain, 125 F.3d 269, 274 (5th Cir. 1997). Because McFarland filed his habeas petition before the effective date of the AEDPA, we review his petition under the pre-AEDPA version of § 2254. See 28 U.S.C. § 2254 (West 1994); cf. 28 U.S.C. § 2254 (West Supp. 1997).

Under the pre-AEDPA standards, we review a state court's determination of mixed questions of law and fact *de novo*. Gochicoa v. Johnson, 118 F.3d 440, 445 (5th Cir. 1997). State court factual findings are entitled to a presumption of correctness, unless certain enumerated deficiencies in the state court proceedings become apparent. See 28 U.S.C. § 2254(d)(West 1994); see also Livingston v. Johnson, 107 F.3d 297, 302-303 (5th Cir.), cert. denied, 118 S.Ct. 204 (1997).

Based on these standards, we find that McFarland has failed to

make a "substantial showing of a denial of [a] federal right." Barefoot v. Estelle, 463 U.S. 880, 893 (1983)(internal quotes and citation omitted); Green v. Johnson, 116 F.3d 1115, 1120 (5th Cir. 1997). We therefore deny his request for a CPC.

## FACTS AND PROCEDURAL HISTORY

McFarland was convicted of capital murder and sentenced to death in accord with the findings of a Texas jury that he stabbed Terry Hokanson to death with a knifelike object while committing or attempting to commit aggravated sexual assault. We do not here recite the details of his crime, for they may be found in the opinion of the Texas Court of Criminal Appeals. McFarland v. State, 845 S.W.2d 824, 828-30 (Tex. Crim. App 1992) (en banc) cert. denied, 508 U.S. 963 (1993). We give only the following brief summary to put the issues raised by this application into factual context.

On February 1, 1988, McFarland and his friend Wilson went to Centerfolds topless bar where the victim, Hokanson, worked. The two men sent a drink over to her, and a waitress, Joann Alexander, later introduced them. McFarland, Wilson, the victim, and Alexander planned to go to Manhattan's bar later in the evening, but Alexander changed her plans. Several employees at Manhattan's remembered seeing a woman who fit Hokanson's description arrive alone and leave with two men. Her car was found in the parking lot of the bar the next morning.

3

Two or three hours after the victim left Manhattan's bar with the two men, three teenaged boys, Mires, Rich, and Warren, heard a scream coming from a public park. One of them saw a car driving away. They continued to walk and noticed someone stumbling in a "drunk manner." The person was Hokanson with blood on her face and in need of help. Warren ran for help, and Hokanson told Rich and Mires that she had been sexually assaulted and stabbed.

Police Officer Rainey happened upon the scene, and the two boys told him that the victim had been sexually assaulted and stabbed. Officer Rainey saw blood on her face and jacket and a deep cut on her hand. The victim told Officer Rainey that two white men, whom she had met at the club where she worked, had raped and stabbed her. Officer Rainey later remembered the full name of the club when he was placed under hypnosis.

Police searched the area and found Hokanson's purse, shoes, watch, and one earring in a pool of blood. There was a five hundred foot long trail of blood leading from her belongings to the spot where she was discovered.

Rachael Revill was Wilson's girlfriend. On the night of Hokanson's death, Wilson and McFarland left her apartment together in McFarland's car and later returned together. Upon their return, Revill noticed what appeared to be blood on Wilson's pants and an apparent gash on McFarland's hand. Wilson gathered his blood-stained clothes and left with McFarland to burn them. Wilson later told Revill that he and McFarland "had to get rid of a girl"

4

because she knew too much about their drug business. He insisted to her that McFarland had actually killed the victim.

Wilson contacted Mark Noblett, an acquaintance of his and McFarland, and told Noblett about the crime and that he was afraid of McFarland. Noblett agreed to meet Wilson the next day, but Wilson did not keep the appointment. Wilson was later found dead.

After exhausting state remedies, McFarland sought habeas and related relief in the district court, which granted leave to proceed in forma pauperis, appointed counsel, allowed the filing of an amended application for habeas, and granted a stay of execution. The district court concluded that each claim raised had been adjudicated on the merits either on McFarland's direct appeal or during his state application for habeas relief.

**ANALYSIS**

I. Ineffective Assistance of Counsel

McFarland contends that trial counsel was ineffective in that he failed: to call Rich and Mires as defense witnesses to testify that they saw a white car, not a blue car, at the crime scene; to object to inadmissible hearsay testimony that non-testifying parties saw a blue car at the crime scene; to offer exculpatory evidence that McFarland's girlfriend owned a rabbit-hair jacket; to object to evidence of McFarland's bad character and prior misconduct; to present evidence that Hokanson knew McFarland and may have used illicit drugs with him before the murder; to object

5

to the prosecutor's comments on McFarland's post-arrest silence; to investigate and call Larry York and Jennie Noblett as witnesses to impeach Mark Noblett's testimony; to investigate and present evidence of Mark Noblett's criminal history, his status as a police informant, and his motive to give false testimony at trial; and to present evidence of Joann Alexander's criminal history to impeach her credibility.

To support his ineffective assistance claim, McFarland must establish the two well-known components of <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984): that counsel's performance was deficient and that the deficient performance prejudiced the defense. Our scrutiny of counsel's performance is deferential, <u>id</u>. at 689, and there is a strong presumption that assistance was adequate and that all significant decisions were made in the exercise of reasonable professional judgment. <u>Id</u>. at 690.

A. Failure to call witnesses

McFarland contends his counsel was ineffective in failing to call numerous witnesses. At the close of the state's case, McFarland testified concerning the decision to rest without presenting evidence. McFarland agreed that he had discussed his options with counsel on that day and that they had jointly decided not to present any evidence. The trial judge questioned McFarland about his decision, and McFarland indicated that he understood his decision and did not wish to change his mind and call witnesses.

6

The state habeas court found that McFarland "agreed with his trial counsel, on the record at the close of the defense's case in chief, not to call any witnesses for the defense." McFarland makes no showing, therefore, that the failure to call the witnesses was the result of deficient performance by counsel.

Despite the foregoing, we have examined in detail each claim of ineffectiveness for failure to call witnesses and find no merit to any. Petitioner has not shown that Rick, Mires, Warren, Weber, Bergeron, Jennie Noblett, or York, the witnesses not called, were available to testify and, had they been called, would have testified in his behalf. McCoy v. Cabana, 794 F.2d 177, 183 (5th Cir. 1986). Counsel's lengthy argument in brief is based on surmise and conjecture and is not evidence of what testimony the witnesses would have given had they been called.

## B. Failure to preserve evidentiary error concerning a blue car

McFarland claims that the testimony of five police officers and a police dispatcher concerning the oral statement of the boys who found the victim that they had seen a blue or dark colored vehicle near the crime scene was inadmissible hearsay. We need not analyze the trial court's rulings and counsel's specific objections in any detail because, even assuming that counsel's failure to make objections was deficient performance, McFarland has not demonstrated prejudice, as required by Strickland. It was of no importance to the outcome of the trial whether the boys saw a blue

7

car in the vicinity of the crime or not.  There was testimony that there was a red and white car, and the warrants to search McFarland's car and to search and arrest McFarland were based upon information obtained from interviews from several sources, not simply the statement of the boys.  McFarland therefore cannot demonstrate prejudice from counsel's alleged errors;  consequently, his claim must fail.

## C.  Failure to object

McFarland next posits that counsel failed to raise a proper objection during the guilt/innocence phase of the trial to Joann Alexander's testimony that he threatened to rape her.  He acknowledges that counsel successfully objected on the grounds that this testimony was "highly prejudicial and totally irrelevant" but complains that counsel did not object to the state's closing argument that the victim did not receive "the warning that Joann got" from McFarland.  The prosecutor was referring to Alexander's testimony, to which defense counsel had successfully objected, that, at one point, McFarland had threatened to rape Alexander if she got into his car with him.  The court had sustained counsel's objection and directed the jury to disregard this evidence. Assuming without deciding that counsel should have objected to the prosecutor's statement, there has been no showing of prejudice; that is, no showing that, on the record as a whole, the error was "so serious as to deprive McFarland of a fair trial, a trial whose

8

result is reliable." See Strickland, 466 U.S. at 687. The prosecutor was discussing evidence found in McFarland's car, which had not been connected to the victim, and opined that it was perhaps from some other woman who entered his car, and with whom McFarland had had a sexual relationship. McFarland cannot demonstrate that the prosecutor's offhand, but arguably improper, reference to Alexander's testimony deprived him of a fair trial; absent a showing of such prejudice, this claim must also fail.

## D. Butler's Testimony

During the guilt/innocence phase of the trial, Melvin Butler testified that, sometime after the murder, he spoke with McFarland at the bar where the victim had worked and that McFarland told him that he had killed before. On cross examination Butler admitted that both were drinking heavily and that he thought McFarland was simply bragging to impress Butler. Defense counsel chose to cross-examine Butler rather than to object to the direct testimony. The cross examination was effective and was a reasonable trial strategy.

## E. Prosecutor's Comments

During closing argument at the punishment phase, the prosecutor commented about McFarland's involvement in drug dealing and patronage of topless clubs. McFarland claims that his counsel should have objected to the argument and to the admissibility of

9

evidence that he dealt in drugs. Counsel did object to the drug evidence in a pretrial motion and was overruled. Failure to object again when the evidence was introduced is not error. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994). The prosecutor's comments were based on the admitted evidence and were thus not subject to objection.

## F. Comments on Silence

McFarland argues that the prosecutor's remarks concerning McFarland's and Wilson's failure to cooperate with the police before McFarland's arrest was inadequate performance that resulted in prejudice. Arguably, counsel should have objected because it was possible that the comments could have been interpreted to refer to post-arrest silence and not simply pre-arrest failure to cooperate. See Doyle v. Ohio, 426 U.S. 610, 617-18 (1976). But, put into context of the entire trial, this alleged error could not have undermined the reliability of the trial's outcome. Earlier, the prosecutor had carefully limited his discussion to the pre-arrest period. The most reasonable interpretation of the questionable comments, then, is that they referred to instances before arrest. Thus, McFarland has not demonstrated that, but for counsel's failure to object, there was a reasonable probability that the result of the guilt-innocence phase would have been different. See Strickland, 466 U.S. at 694.

## G. Criminal Histories for Impeachment

McFarland contends that counsel should have impeached State witnesses Noblett and Alexander with their criminal histories to demonstrate that they had motives for testifying for the State other than the reasons they gave. The record demonstrates that McFarland suffered no prejudice from counsel's asserted errors. The criminal histories of both witnesses were brought out in their testimony in such detail as to permit the jury to fairly evaluate their credibility. Further cross-examination on the subject would have only been cumulative.

## II. Brady Claim

McFarland alleges several due process violations for failure to comply with Brady v. Maryland, 373 U.S. 83 (1963). First, he asserts that the State suppressed the statements of Mires, Rich and Warren and that these statements contain exculpatory evidence concerning the identity of the victim's assailant. The state court ruled that the defense was aware before trial that the three had given statements; the allegedly critical language from the statements was quoted verbatim in an affidavit supporting a search warrant that the defense had; and counsel had the names, addresses, and phone numbers of the witnesses and was able to make effective use of the information during trial. McFarland has pointed to no irregularity in the state court proceedings that would impugn these factual findings. Furthermore, our own review of the record

11

convinces us that the allegedly suppressed evidence is not exculpatory at all. See 28 U.S.C. § 2254(d)(West 1994); Livingston, 107 F.3d at 302-03.

Next McFarland complains that the State suppressed evidence of three outstanding warrants for the State's witness Noblett. McFarland argues that these warrants showed bias of the witness and that the charges were all dismissed after the witness testified. The state court found that the State had made no agreement to provide leniency to Noblett in exchange for his testimony. McFarland makes no showing that would call this finding into question. The finding was the result of a hearing conducted on McFarland's motion for a new trial based on the same allegations.

Finally, McFarland alleges that the State violated Brady by failing to disclose an agreement to give leniency to Alexander in exchange for her testimony. His proof of the agreement is the affidavit of a Florida prosecutor that, at the request of federal and state prosecutors in Texas, he dismissed Alexander's probation and recalled a warrant for her arrest; and that the request was made as a result of Alexander's cooperation in a murder case.

The state habeas court found that the State was unaware at trial of an outstanding warrant for Alexander in Florida and that the State had made no offer to or agreement with her regarding her testimony. The record fully supports this finding. The prosecutor did, after the trial, learn that Alexander had been incarcerated in Texas on a warrant, and did, at the request of Alexander's husband,

12

attempt to obtain her release on Thanksgiving day. He was unsuccessful. McFarland presents no convincing argument that the state court's factual findings are not entitled to their statutory presumption of correctness. See 28 U.S.C. § 2254(d)(West 1994).

For the foregoing reasons, we find that McFarland has failed to establish that the state suppressed exculpatory evidence in violation of Brady.

## III. Other Due Process Violations

There was testimony from the investigating officers at the scene and from the police dispatcher that one or more of the three boys who discovered the victim said that they had seen a blue car near the scene. McFarland claims that the boys said they saw a white car. Our review of the record shows that the police testimony was not perjured, although it may have been mistaken. Regardless, the testimony was not material to anything.

Mark Noblett returned from the Bahamas where he was living and testified for the state against McFarland. His reason for doing so, he said, was that his mother had sent him a newspaper clipping about the murder, and he recalled the information he had received from Wilson, McFarland's accomplice. McFarland claims that this testimony was perjured; that Noblett's real reason for returning was to obtain leniency from the state for his own problems with the law, and because he was a "snitch" for the state. On this record, we find that Noblett's motive for returning to testify was not

13

material (his legal problems were made known to the jury) and that his testimony concerning his motives was not perjured.

As his final effort to find perjured testimony, McFarland claims that Alexander's testimony that she introduced the victim to McFarland on the date of the murder was false. He claims that Alexander admitted to an investigator that she made the introduction two days before the murder. However, McFarland offers no proof of any kind of this admission.

For his final claim of due process violation, McFarland contends that his rights were violated by the admission of certain evidence concerning the death of Wilson, his accomplice in this crime, and by the prosecutor's closing argument concerning Wilson's death. He argues that the State violated his due process rights by introducing evidence that Revill and Wilson were afraid of McFarland; that Wilson wanted Noblett to assist in informing the police about McFarland's role in the death and rape of Hokanson; and that Wilson was the victim of a homicide.

"[E]ven the erroneous admission of prejudicial testimony does not justify habeas relief unless it is material in the sense of a crucial, critical, highly significant factor." Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir. 1983) (internal quotes and citations omitted). Petitioner must demonstrate that the error made the trial fundamentally unfair. Bagley v. Collins, 1 F.3d 378, 380 n. 2 (5th Cir. 1993). Our review of the record convinces us that McFarland has not carried this burden. Revill testified

14

that Wilson cautioned her not to let McFarland know that she knew about the rape and murder because McFarland would hurt her. On cross-examination, defense counsel brought out that Revill did not tell the police of this on her initial contact with them. On redirect Revill stated that when she heard that Wilson had been killed she thought she would be next. There was no objection. She was then asked if she learned McFarland's whereabouts at the same time she learned of Wilson's death. There was no objection.

While this testimony may have been important, its admission was not error. Wilson confessed to his involvement in the crimes against Hokanson and was dead. There was no fundamental unfairness in permitting Revill to testify to her reasons for coming forward with the information.

In his summation of the evidence, the prosecutor made reference to this testimony. It was not error to do so since the evidence was properly admitted. Even if the evidence had not been properly admitted, we must view the prosecutor's remarks in the context of the entire trial to determine if they were a "crucial, critical, highly significant factor in the jury's determination of guilt." Ortega v. McCotter, 808 F.2d 406, 410-11 (5th Cir. 1987). The district court ruled that the prosecutor's remarks did not rise to this level of importance, and our independent review of the record convinces us that it was correct.

IV. Hypnotically-enhanced Testimony

Over objection, the State introduced the hypnotically-enhanced testimony of Officer Rainey concerning his conversation with the victim at the scene shortly before her death. McFarland contends that his rights under the Due Process and Confrontation Clauses were infringed by admission of this testimony. He claims that: the examiner's independence was questionable because he was trained by and worked for the State and spoke with two of the investigating officers before the interview; the examiner failed to keep appropriate records; and the examiner allowed other officers to participate in the interview. The record does not support these claims. The evidentiary hearing conducted by the trial court out of the jury's presence in response to McFarland's objection establishes fully the propriety of the conduct of the interview and the competence of the interviewer.

Without hypnosis, Officer Rainey recalled that the victim said the name of her place of employment. He remembered that the first part of the name was "Center", but could not recall the last part. Under hypnosis he recalled that it was "Centerfold". He also recalled that the victim said that she had first met her attackers that night.

McFarland did not demonstrate to the trial court, and has not demonstrated to us, that this testimony was in any way untrustworthy. As noted, the record clearly shows that the interviewer was qualified and had no investigative responsibility in the case, no outside influence was exercised in the interview

16

and it was conducted in accord with all applicable principles.

V. Confrontation Clause

Mark Noblett and Rachel Revill gave hearsay testimony concerning Wilson's statements that implicated McFarland in the crime. He claims that this violated his rights under the Confrontation Clause and that the Court of Criminal Appeals erred when it rejected this claim. He argues that Wilson's statements were not against Wilson's penal interest as the court found, but were self-serving because Wilson was seeking Noblett's help with the police in connection with his own problems.

The Sixth Amendment right to confrontation does not preclude admission of all hearsay testimony. Cupit v. Whitley, 28 F.3d 532, 536 (5th Cir. 1994). Hearsay is admissible if it bears adequate indicia of reliability, and contains "particularized guarantees of trustworthiness." Sherman v. Scott, 62 F.3d 136, 140 (5th Cir. 1995), cert. denied, 116 S.Ct. 816 (1996). "[T]hese 'particularized guarantees of trustworthiness required for admission under the Confrontation Clause must...be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief.'" Id. (quoting Idaho v. Wright, 497 U.S. 805, 820 (1990)). "Finally, '[if] the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule [and the Confrontation

17

Clause] do []not bar admission of the statement at trial.'" Id.

Revill's and Noblett's testimony was significant evidence against McFarland. They testified that Wilson told them that he and McFarland had to get rid of the victim, and that Wilson was now dead. Revill testified that Wilson returned to Revill's apartment immediately after the crime, changed clothes, burned the clothes he had been wearing, and later told her what happened to the victim. Revill was Wilson's girlfriend, and it is reasonable that he would confide in her under the circumstances. Even though Revill was afraid of McFarland, she did not agree to speak with the police until she knew Wilson was dead and McFarland had gone to the east coast after she moved from Texas to Maryland.

Noblett testified that he knew Wilson and McFarland from frequenting the club where the victim worked. He said that, shortly after the murder, Wilson called and set up a meeting with him. At the meeting Wilson was terrified, very nervous, and apprehensive. Wilson told Noblett that he and McFarland had left the club with the victim and that a rape and murder had occurred. Wilson wanted to turn himself in to police and sought Noblett's help in doing this.

The totality of the circumstances under which Wilson made the statements to Revill and Noblett render him particularly worthy of belief, and the admission of the hearsay thus did not violate the Confrontation Clause.

18

## VI. Cumulative Effect

McFarland seeks a new trial because of the claimed cumulative effect of the alleged errors.

As we have shown, McFarland has not: demonstrated error, shown that the State offered perjured testimony, proven that it suppressed evidence, nor demonstrated that he was deprived of the effective assistance of counsel. Accordingly, his claim fails.


## VII. Miscellaneous

We have carefully reviewed McFarland's Penry claim relative to the jury charge, his claim of counsel's failure to introduce evidence of a rabbit fur coat, and his claims relative to discovery, and the record related to each, and we find all to border on the frivolous and do not discuss them.


**CONCLUSION**

McFarland has completely failed to make a substantial showing of the denial of a federal right. Accordingly, we deny his request for a certificate of probable cause and vacate his stay of execution.

CERTIFICATE OF PROBABLE CAUSE DENIED. STAY OF EXECUTION VACATED.

19